**CIVIL ACTION NO. 3:13CV-00785-JHM**

**THOMAS O'HEARN EIFLER, JR**                                              APPELLANT

**V.**

**WILSON & MUIR BANK & TRUST**                                          APPELLEE
**COMPANY**

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on an appeal from the Bankruptcy Court.  The Appellant, Thomas Eifler, argues that the Bankruptcy Court erred when it denied Appellant's discharge pursuant to 11 U.S.C. § 727(a)(2), (a)(4) in the amount of $1,701,793.66 owed to Wilson & Muir Bank & Trust Company [DN 6]. Also before the Court is Appellee's Motion for Oral Argument [DN 17].  Fully briefed, these matters are ripe for decision.  For the following reasons, the Court **AFFIRMS** the decision of the Bankruptcy Court.  The Court **DENIES** Appellee's Motion for an Oral Argument [DN 17].

## I.  BACKGROUND

This appeal arises out of an adversary proceeding filed by Wilson & Muir Bank & Trust Company ("Bank"), the Appellee, against Thomas Eifler ("Debtor" or "Eifler").  In that action, the Bank sought to deny discharge to some or all of the debt owed to it by Debtor pursuant to 11 U.S.C. §§ 523(a)(2)(A)-(B), 523(a)(6), 727(a)(2)(A), 727(a)(4), 727(a)(5).  Following a trial on the issues and multiple filings by both parties, the Bankruptcy Court denied discharge to Debtor for all debts owed to Bank pursuant to 11 U.S.C. § 727(a)(2), (a)(4).  The Debtor appeals that decision.

### A. Wilson & Muir's Loans to Debtor

In 2005 Eifler consulted with Ardis Greenamyer ("Greenamyer") about the possibility of starting a crane and hoist business. In the following year, Debtor formed several single-member limited liability companies and began the process of obtaining financing for these businesses through discussions with several lending institutions, including Wilson & Muir. On May 11, 2007, the Bank extended its first commercial loan to Debtor for $598,242.00, which was secured by Eifler in his official capacity with the business and by him personally. Over the course of that year, the Bank extended two more commercial loans on June 7, 2007 and December 24, 2007 for $730,152.15 and $351,895.00, respectively.

In addition to commercial loans, Wilson & Muir and Debtor entered into a Home Equity Line of Credit ("HELOC") in the amount of $700,000 on August 8, 2007. At the time, the title to the home located at 407 Jarvis Lane, Louisville, Kentucky ("Jarvis Lane Property") was held in Mr. Eifler's name alone. It was purchased in 1996 for approximately $245,000, with a $45,000 down payment and a $200,000 mortgage on the property. In 1997, Mrs. Eifler used a $125,000 inheritance to pay down a portion of the mortgage on the property, despite the fact that she held no title ownership in the property.

The terms of the HELOC allowed Mr. Eifler to quickly gain access to funds without needing to make any prior representations as to his financial condition. While the Bank generally required a loan officer to approve a large draw on the HELOC, the draw would be approved as long as it was within the credit limits of the loan. Mrs. Eifler did not sign the HELOC,[1] but she, along with Mr. Eifler, signed the Real Estate Mortgage Revolving Credit Account ("Mortgage") that granted the Bank a mortgage in the Eifler's home in order to secure

---

[1] According to the Bankruptcy Court, "Eifler presented evidence that he offered to make Ashley a party to the HELOC, but for some undetermined reason she never became a party to that loan agreement." [Mem., DN 7-1, at 5].

the HELOC. Wilson & Muir extended the $700,000 line of credit based upon an appraisal of the Jarvis Lane Property showing the property value at $1 million. On September 22, 2009, Mr. Eifler transferred the Jarvis Lane Property to Mrs. Eifler by deed. The Eiflers decided to transfer the property to Mrs. Eifler after consulting with James Brown, an estate planning attorney, who advised them to do so in order to equalize their marital assets. However, Wilson & Muir was not notified of the transfer of the property. In fact, a financing statement submitted by Debtor to Bank on May 11, 2010 listed the Jarvis Lane Property as belonging to both Mr. and Mrs. Eifler.[2] After the transfer of property to Mrs. Eifler, Mr. Eifler made payments on the HELOC in the amount of $372,165.00.

**B. Greenamyer Suit**

At some point in early 2009 or late 2008, Eifler's relationship with Greenamyer soured. Greenamyer filed a lawsuit in Jefferson County Circuit Court on February 11, 2009, alleging, *inter alia*, a 50% ownership interest in Eifler's crane and hoist LLCs. Although Greenamyer initially filed the suit *pro se*, he eventually retained counsel who filed an amended complaint on his behalf. The parties did not resolve the lawsuit prior to Eifler filing for bankruptcy.

**C. Final Draw on HELOC and Retention of Counsel**

By October of 2010, Debtor indicated that his crane and hoist companies were suffering significant financial issues. On October 25, 2010, Mr. Eifler drew $340,000 on the line of credit extended to him under the terms of the HELOC. This final draw took the remaining amount of available credit down to zero. That same day, Eifler took the full $340,000 and deposited the funds in a joint account at Commonwealth Bank. Then, on November 2, 2010, Eifler transferred the full $340,000 to a joint account at Fidelity Investments ("Fidelity"). This transfer occurred

---

[2] Mr. Eifler submitted two previous financing statements to Wilson & Muir regarding his assets. In both of those previous financing statements, he listed the Jarvis lane property solely under his name.

only a day after a meeting at Wilson & Muir in which Eifler informed the Bank that he was holding the $340,000 at Commonwealth Bank.

On December 10, 2010, Eifler began seeking legal advice from Tom Frentz ("Frentz"), a bankruptcy attorney, to assist in liquidating business assets to pay lenders. Initially, it appears that Eifler hired Frentz as a workout specialist, not for the purpose of filing for bankruptcy. However, starting in January of 2011, the time sheets from Frentz's office reflected research on bankruptcy issues. Although Eifler contended that bankruptcy was not discussed until November of 2011, the Bankruptcy Court found his testimony not credible based on multiple entries on time sheets from Frentz's office that reflected research into bankruptcy issues. On January 27, 2011, Marie Fields, a paralegal in Frentz's office, recorded time for researching and drafting a memo on non-dischargeability issues for Eifler. Additionally, Frentz's time sheets reflected research on preference law and pre-payments on February 28, 2011, which was just three days after Wilson & Muir filed a collection action in Jefferson Circuit Court.

The $340,000 from the final HELOC draw remained in a joint Fidelity account until March 4, 2011. At that time, Eifler had Fidelity split the money equally into two individual accounts, one of which was held by him and the other held by Mrs. Eifler.[3] According to Frentz's testimony, he perceived this split of the HELOC acceptable because he considered the funds to be marital property in which both Mr. and Mrs. Eifler had an equitable interest. Frentz's recommended splitting the Fidelity account at some point in January of 2011 even though Eifler did not do so until March. In between Mr. Frentz's advice and the actual splitting of the funds, Wilson & Muir filed a collection action against Eifler in Jefferson Circuit Court on February 23, 2011.

---

[3] Due to investment of the $340,000, the split of the Fidelity account actually resulted into Mr. and Mrs. Eifler each receiving $176,927.81.

On May 3, 2011, Mr. Eifler transferred $41,825, representing one-half of the Eifler's 2010 income tax refund, to Mrs. Eifler. A month later, on July 7, 2011, Eifler transferred $20,000 to his sister-in-law out of his individual Fidelity account even though Mrs. Eifler's account contained ample funds to make such a transfer. On December 15, 2011, Eifler made two significant transfers. The first was to Mrs. Eifler for $28,234.38, one-half of Mr. Eifler's paycheck. The second was to St. Xavier High School in the amount of $12,000, which was a prepayment of tuition made nine months in advance. The following day, Eifler made another tuition prepayment to Sacred Heart Model School in the amount of $16,900, which was also made nine months in advance. The final transfer on December 22, 2011, a week before filing bankruptcy, was to Mrs. Eifler for $3,613.12, one-half of Mr. Eifler's paycheck. At the time Mr. Eifler filed for bankruptcy, he only had $22.04 in his individual Fidelity account and Mrs. Eifler had $103,786.73 in her account.

### D.  Bankruptcy and Schedules and Statement of Financial Affairs

After filing for bankruptcy on December 29, 2011, Eifler submitted his Bankruptcy Schedules and Statement of Financial Affairs ("SoFA") on January 12, 2012. Prior to filing the Schedules and SoFA, Frentz stated that Mr. Eifler would have had about three or four opportunities to review all the information provided on the statements. The Bankruptcy Court summarized Frentz's process as follows:

> (1) he first has clients fill out the documents in pencil, (2) the Schedules and SoFA were then typed up and reviewed by the client for errors, (3) errors would have been corrected and the documents would have been reviewed again by the client, and (4) finally, they would have been typed in final, at which time Frenz and the client would have gone over them together. Only after these steps had been taken would the Schedules and SoFA been filed.

(Mem., DN 7-1, at 27-28, ¶ 157).

Eifler's Schedule B (Personal Property) listed only a one-half interest in his Joint Commonwealth Bank account in the amount of $521. Eifler failed to list on either Schedule B or the SoFA his individual Fidelity account, a Forex.com investment account,[4] and a Wilson & Muir checking account.[5] In addition to failing to list certain accounts, Eifler's SoFA failed to identify several transfers made by him leading up to his filing of bankruptcy. The Bankruptcy Court identified two sections, Number 10 ("Other transfers," transfers made within two years prior to filing for bankruptcy outside the ordinary course of business) and Number 7 ("Gifts," transfers made within a year of bankruptcy), that Appellant left completely blank on the SoFA. Specifically, the Bankruptcy Court identified the following six transfers that should have been listed on Debtor's SoFA:

a. The March 29, 2011 transfer of approximately $177,000 to Ashley;
b. The May 3, 2011 transfer of $41, 825.00 to Ashley;
c. The July 7, 2011 transfer of $20,000.00 to the sister-in-law in Switzerland;
d. The tuition pre-payments of over $ 45,000.00 made on December 15 and 16, 2011;
e. The December 15, 2011 transfer of $28,234.38 to Ashley; and
f. The December 22, 2011 transfer of $3,613.12 to Ashley.

[Mem., DN 7-1, at 27].

Finally, the Bankruptcy Court found Eifler unresponsive or unforthcoming during questioning by the Chapter 7 Trustee and counsel of Wilson & Muir. According to the Bankruptcy Court, Eifler told Gordon Rowe, the Chapter 7 Trustee, on February 2, 2012 that half of the HELOC proceeds were in Mrs. Eifler's individual Fidelity account even though only $103,786.75 of the $176,927.81 originally deposited into her account remained at the time of the meeting. Additionally, the Bankruptcy Court concluded that Eifler failed to fully answer

---

[4] Wilson & Muir did not learn about the Forex.com account until the fourth day of trial on April 26, 2013.
[5] Appellant disputes whether two of his accounts, the joint Fidelity account and his individual Fidelity account, had to be reported on Number 11 of his SoFA because Number 11 only requires the listing of closed accounts and those two accounts still had funds when Eifler filed for bankruptcy.

questions from Wilson & Muir's counsel concerning certain draws on the HELOC at the creditors meeting on March 1, 2012. Although Appellant could not completely answer questions about the draws at the March 1, 2012 meeting and apparently during the deposition for the adversarial action, "Eifler was able to satisfactorily explain the disposition of the various draws [during trial]." [Mem., DN 7-1, at 28].

## II. STANDARD OF REVIEW

A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" of the bankruptcy court. 28 U.S.C. § 158(a). On appeal, a district court reviews the bankruptcy court's finding of fact under a clearly erroneous standard, but reviews *de novo* the bankruptcy court's conclusions of law. Nicholson v. Isaacman (In re Isaacman), 26 F.3d 629, 631 (6th Cir. 1994). A finding of fact is clearly erroneous when "although there is evidence to support that finding, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Kalamazoo River Study Group v. Rockwell Intern. Corp., 274 F.3d 1043, 1047 (6th Cir. 2001) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

## III. DISCUSSION

In this appeal, the Appellant presents three mains issues for review by this Court: (1) the Bankruptcy Court's conclusion that Eifler intended to hinder, delay, or defraud his creditors under § 727(a)(2)(A); (2) the Bankruptcy Court's finding that Eifler made false statements under oath that required a denial of discharge under § 727(a)(4)(A); and (3) the Bankruptcy Court's rejection of Eifler's argument that he relied on Mr. Frentz's advice in good faith. The Appellee contends that the Bankruptcy Court properly denied discharge to Appellant under both § 727(a)(2)(A) and § 727(a)(4)(A).

**A. Discharge under § 727(a)(2)(A)**

Appellant advances multiple theories to contest the Bankruptcy Court's determination that he transferred property for the purpose of hindering or delaying his creditors. First, Appellant contends that the Bankruptcy Court incorrectly identified the movement of certain property to his wife as "transfers" under the Bankruptcy Code. Appellant argues that these could not have been "transfers" because his wife had a pre-existing interest in the property. Second, the Appellant contends that even if the movement of property to his wife was deemed a "transfer" under the statute, he did so based on good faith reliance on advice from his attorney. Based on these arguments, Eifler contends that the Bankruptcy Court should not have denied him a discharge under § 727(a)(2)(A).

For the purposes of this action, § 727 reads, in pertinent part as follow:

(a) The court shall grant the debtor a discharge, unless—
   . . .

   (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed . . .

   (A) property of the debtor, within one year before the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2)(A). "This section is to be liberally construed in favor of the debtor, and the party objecting to discharge bears the burden of proof by a preponderance of the evidence." In re Swegan, 383 B.R. 646, 653 (B.A.P. 6th Cir. 2008) (citations omitted).

**1. Analysis under § 727(a)(2)(A)**

The Court must review the Bankruptcy Court's determination that Wilson & Muir demonstrated by a preponderance of evidence that Appellant's actions fell within § 727(a)(2)(A). "This section encompasses two elements: 1) a disposition of property, such as concealment, and

2) 'a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act disposing of the property.'" In re Keeney, 227 F.3d 679, 683 (6th Cir. 2000) (quoting Hughes v. Lawson (In re Lawson), 122 F.3d 1237, 1240 (9th Cir. 1997)). Based on the previous discussion, it is clear that Appellant disposed of property under the first element. As to the second element, a debtor's conduct must be scrutinized "[b]ecause it will be a rare occasion when a debtor stands up and admits that he intended to defraud his creditors . . . ." [Mem., DN 7-1, at 43]. Therefore, courts examine a debtor's actions for the following "badges of fraud":

> (i) the lack of adequate consideration for the transfer; (ii) the family, friendship, or close relationship between the parties; (iii) the retention of possession, benefit, or use of the property in question by the debtor; (iv) the financial condition of the party sought to be charged prior to and after the transaction in question; (v) the conveyance of all of the debtor's property; (vi) the secrecy of the conveyance; (vii) the existence or cumulative effect of a pattern or series of transactions or course of conduct after incurring of debt, onset of financial difficulties, or pendency or threat of suit by creditors; and (viii) the general chronology of events and transactions under inquiry.

In re Courtney, 351 B.R. 491, 500 (Bankr. E.D. Tenn. 2006) (citations omitted). If the plaintiff establishes the existence of badges of fraud, the burden shifts to the debtor to rebut the presumption. Id. (citing Village of San Jose v. McWilliams, 284 F.3d 785, 791 (7th Cir. 2002)).

Based on these potential factors, the Bankruptcy Court concluded that "the transfers were to an insider (Ashley and sister-in-law) or for the benefit of an insider (children's tuition). With respect to the funds transferred to Ashley, Eifler retained possession or control of the funds transferred." [Mem., DN 7-1, at 44]. The Bankruptcy Court also examined the remaining potential factors, including the fact that Mr. Eifler listed only $521.00 in his bank account at the time of filing for bankruptcy. Of course, this is particularly significant since Mr. Eifler had withdrawn $340,000 from HELOC only nine months prior. Additionally, it is clear that Mr. Eifler transferred assets to Mrs. Eifler and his sister-in-law with no consideration. The totality of

Mr. Eifler's actions, just prior to filing for bankruptcy, appears to cover the complete gambit of concerns flagged by a "badges of fraud" analysis.

Based on the reasons previously set forth, the Court must agree with the conclusion of the Bankruptcy Court that that "[r]ather than conserving assets, Eifler took multiple, deliberate steps to shield his assets from his creditors." [Mem. DN 7-1, at 45]. As such, the Bankruptcy did not err determining that the Wilson & Muir proved by a preponderance of evidence the elements under § 727(a)(2)(A).

### 2. Division of "Marital Property"

Appellant argues that the movement of assets to his wife was not a "transfer" but a division of marital property. Section 101(54) of the Bankruptcy Code defines "transfer" for the purposes of § 727(a)(2)(A) as follows:

> (54) The term "transfer" means—
> . . .
>
> (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—
>
>> (i) property; or
>>
>> (ii) an interest in property.

11 U.S.C. § 101(54). In reliance on this section, Appellant states, "Mr. Eifler's 50/50 division of money with his wife can only be a transfer of his interest in property under § 727(a)(2)(A) if his wife did not already own the portion 'transferred' to her." [Reply Br. for Appellant, DN 16, at 3]. Appellant contends that Mrs. Eifler had a pre-existing 50% interest in the property because the assets in question were acquired during the marriage, and thus, the assets would be considered marital property.

In order to determine whether Mrs. Eifler had an interest in the property allocated to her, the Court must apply Kentucky law as to the status of the property. See Barnhill v. Johnson 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."). Kentucky defines marital property as "all property acquired by either spouse subsequent to the marriage . . ." except for those things specifically excluded. KRS § 403.190(2). Appellee contends that the plain text of KRS § 403.190 only applies the marital property concept in the context of a dissolution of marriage. The Court agrees. The concept has no application in this case—there was no divorce.

Although Appellant fails to address the applicability of KRS § 403.190, he maintains that Kentucky law clearly establishes for an equal division of property between debtor and non-debtor spouse. Appellant primarily relies on Wilder v. Wilder, 294 S.W.3d 449 (Ky. Ct. App. 2009) to suggest that Mrs. Eifler retains a 50% interest in the joint income tax return. In Wilder the main issue was whether the trial court could divide marital property after the entry of a final divorce decree. Id. at 451. In fact, the appellate court's only determination as to the 50% split in proceeds was to simply say that there was no abuse of discretion in the trial court's distribution of the stimulus payment. Id. at 452. However, it is apparent that even courts in the Sixth Circuit are split as whether a nondebtor, nonwage-earning spouse has a right to a tax refund from a jointly filed tax return. See In re Griffin, 339 B.R. 900, 902 (Bankr. E.D. Ky. 2006) (quoting In re Taylor, 22 B.R. 888, 889 (Banrkr. N.D. Ohio 1982)) ("Courts in this circuit have consistently held 'the non wage earning spouse has no property interest in, and therefore is entitled to no exemption in the proceeds of the tax refund.'"). But see In re Aldrich, 250 B.R. 907, 912 (Bankr. W.D. Tenn. 2000) ("[I]t would be "incongruous" to consider only the marital spouses' financial

contributions . . . completely ignore the substantial contributions of a non-income producing homemaker, who performs valuable but economically uncompensated services for the family.").

The Court need not decide this question. Even the Bankruptcy Court acknowledged that "maybe one or two transfers could be understood, but in this case there were at least six transfers totaling a significant amount of funds . . . . [t]he Court cannot help but find that Eifler was engaging in a scheme to shelter or insulate these assets from the reach of his creditors." [Mem., DN 7-1, at 44]. Even if the Court accepts the proposition that the refund from the joint tax return was as much hers as his, the other transfers support the finding of the Bankruptcy Court.

For instance, the HELOC draw. Appellant contends that Mrs. Eifler owned at least 50% of the October 25, 2010 HELOC draw of $340,000. The Appellant characterizes the draw from the HELOC as a draw against the equity of the home, and thus, a draw against Mrs. Eifler's solely owned property. Appellant asks the Court to consider the draw as an asset belonging to Mrs. Eifler, so that any movement of money was not a transfer for the purposes § 727(a)(2)(A). In contrast, the Bankruptcy Court characterized Appellant's actions as follows:

> While Eifler denied he was trying to insulate the funds from Wilson & Muir, he did understand that Ashley was not liable to Wilson & Muir on any of the commercial notes and that Wilson & Muir possessed no contractual grounds to bring a claim against Ashley. In sum, by transferring the funds to Ashley, Eifler clearly removed an asset from his portfolio and placed it beyond the reach of his creditors, while still maintaining and full authority over the funds.

[Mem., DN 7-1, at 40].

The Court agrees with the conclusion of the Bankruptcy Court. Mr Eifler took out the HELOC at a time when he held title to the property in his name alone. Mrs. Eifler signed the mortgage but not the note. She had no rights in the loan proceeds. This did not change even after the property was transferred into her name alone. Essentially, Mr. Eifler borrowed money from Wilson & Muir, incurred additional debt, and deposited the loan proceeds in a joint account

with Commonwealth Bank. He later wired the money into a joint Fidelity account. Thereafter, he directed that half of the funds be placed in an account solely in Mrs. Eifler's name. The evidence clearly shows this was done to hinder his creditors.

If a debtor, within one year of filing bankruptcy, individually borrows money from a bank, and places that money into an account in his wife's name, and does so with the intent to hinder his creditors, the debtor will be denied discharge. The fact that Mrs. Eilfer owned the house in her name alone, and that the money was held in a joint account for a time, does nothing to make this a legitimate transfer.

The two remaining transfers to his children's schools for prepayment of tuition and to Mr. Eifler's sister-in-law were clearly from his individual account. Other than Appellant's argument that Mrs. Eifler owned the full proceeds drawn from the HELOC, he offers no legal basis why the tuition prepayment and the money sent to his sister-in-law were not transfers for the purposes of hindering or delaying creditors. He reserves arguments to these two transfers under his reliance-on-counsel defense.

### 3. Good Faith Reliance on Advice of Counsel

Appellant next contends that the division of his assets prior to filing for bankruptcy was done so after seeking advice from his counsel, Tom Frentz. As a result, Appellant maintains that "[w]here an experienced bankruptcy lawyer advised him that a transaction was appropriate, Mr. Eifler could not have intended to defraud creditors in doing it." [Br. for Appellant, DN 6, 28]. As to Appellant's reliance-on-counsel defense, the Bankruptcy Court found as follows:

> Upon review of the evidence presented, the Court must conclude that Eifler's alleged reliance on Frentz's advice was neither reasonable nor in good faith. First, assuming *arguendo* that Frentz did indeed advise Eifler to transfer these assets to or for the benefit of insiders, it is simply not reasonable to believe it appropriate to transfer a significant portion of assets within months, or weeks, of filing for

bankruptcy. Moreover, Frentz's legal advice injecting a marital property concept into the bankruptcy context was not reasonable in and of itself.

[Mem., DN 7-1, at 45]. Appellant argues that the Bankruptcy Court erred in coming to this conclusion.

"Generally, reliance on counsel can show that the Debtor lacked the requisite intent required to deny his discharge." In re Swegan, 383 B.R. 646, 656 (B.A.P. 6th Cir. 2008) (citing First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1343 (9th Cir. 1986)). "The elements of a reliance on counsel defense are (1) full disclosure of all pertinent facts to counsel, and (2) good faith reliance on counsel's advice." United States v. Lindo, 18 F.3d 353, 356 (6th Cir. 1994) (citing United States v. Duncan, 580 F.2d 1104, 1116 (6th Cir. 1988)). However, "[a] finding that the debtor knew that the purpose of the transfers was to hinder or delay a creditor is inconsistent with good faith and precludes the debtor's assertion of this defense even where he is otherwise innocent of any improper purpose." In re Snell, 240 B.R. 728, 731 (Bankr. S.D. Ohio 1999) (citing Adeeb, 787 F.2d at 1343).

Appellant's main argument as to this issue is that due to the complexity of bankruptcy and these matters, he could not have known that a Bankruptcy Court would disagree with Mr. Frentz's marital property theory. The difficulty in accepting Appellant's argument is that he engaged in not one transfer but multiple transfers to his wife and to others. If the Court were to accept that these transfers were permissible because Eifler relied on advice of counsel, then the reliance-on-counsel defense would swallow what § 727(a)(2)(A) seeks to prohibit. In other words, the purpose of the defense cannot be to allow a debtor to deplete all of his assets before bankruptcy, obtain a fresh start, and then reap the benefits of transferring assets to insiders. Simply put, the "'reliance upon advice of counsel' is not an 'impenetrable shield' behind which a

debtor may continually hide." In re Leone, 463 B.R. 229, 243 (Bankr. N.D.N.Y. 2011) (quoting In re Dubrowsky, 244 B.R. 560, 575 (E.D.N.Y. 2000)).

In this case, Mr. Eifler did not need to understand the complexity of bankruptcy to know that creditors would be extremely concerned about the transfers he made prior to filing. Mr. Frentz's advice to Mr. Eifler reflected the exact concern that came to fruition in the adversary action filed by Wilson & Muir this case. Specifically, Mr. Frentz explained, "I say as I stated before, we talked about the risk that might run with an insider transfer that he, should he ever have to file bankruptcy and that stood true for the division. We talked about it."[6] [April 25, 2013 Trial Tr. Excerpts, DN 11-5, at 32]. Clearly, the Bankruptcy Court found these statements concerning when it concluded that "Frentz fully explained the possible, and probable, consequences to Eifler for making these transfers, yet Eifler decided to proceed with the transfers notwithstanding Frentz's warnings." [Mem., DN 7-1, at 48]. There appears to be sufficient factual support for the Bankruptcy Court to have rejected Appellant's reliance-on-counsel defense in this case.

For those reasons, the Bankruptcy Court did not clearly err in determining that Appellant-Debtor failed to assert the facts necessary to advance an advice of counsel defense under § 727(a)(2)(A).

## B. Discharge under § 727(a)(4)(A)

Appellant argues that the Bankruptcy Court erred when it denied discharge based on § 727(a)(4)(A), which prohibits a debtor from making a false oath in connection with a bankruptcy proceeding. Appellant contends that the Bankruptcy Court failed to properly address his

---

[6] It is interesting to note that one issue of real debate among courts involving the split of a jointly filed tax return was one of the things that Mr. Frentz did not know about until Mr. Eifler transferred the funds to Mrs. Eifler. When asked specifically about this transfer, Mr. Frentz responded, "I may have learned about it later, but I don't think I knew about it beforehand, no." [April 25, 2013 Trial Tr. Excerpts, DN 11-5, at 33].

argument that he relied on advice of counsel when he filled out the SoFA and that any omissions on the forms were inadvertent.

"The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to do costly investigations." United States Tr. v. Zhang (In re Zhang), 463 B.R. 66, 86 (Bankr. S.D. Ohio 2012) (quoting Jahn v. Flemings (In re Flemings), 433 B.R. 230, 237 (Bankr. E.D. Tenn. 2010)). In order to deny a debtor discharge under this § 727(a)(4)(A), a plaintiff must establish the following five elements: "1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case." In re Keeney, 227 F.3d 679, 685 (6th Cir. 2000) (citing Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir. 1992)). Because an analysis under § 727(a)(4)(A) is a question of fact, an appellate court reviews a decision by a bankruptcy court under the clearly erroneous standard. See Id.

In denying Appellant's discharge under § 727(a)(4)(A), the Bankruptcy Court outlined multiple instances where the Debtor made false oaths in this case. The Bankruptcy Court concluded that "the record [was] replete with false oaths made by Eifler," based on the following:

> Eifler did not disclose on his SoFA the $177,000.00 transfer to Ashley from the HELOC draw. He did not disclose his transfer of half of his income tax refund to Ashley. He did not disclose his two transfers of salary made within two weeks of the filing of the bankruptcy. He did not disclose his $20,000.00 transfer of funds to his sister-in-law. He did not disclose his pre-payments of tuition. He did not disclose an individual Fidelity brokerage account. He did not disclose the Joint Fidelity Account. He did not disclose the Forex currency trading account. Finally, he testified false at his 341 meeting about how much of the HELOC proceeds were still in Ashley's individual account.

[Mem., DN 7-1, at 49-50].

Appellant claims that the complexity of the SoFA and bankruptcy schedules resulted in him misunderstanding what transfers needed to be reported. When Appellant made this argument to the Bankruptcy Court, it concluded that "it [was] 'transparently plain' that these transfers and bank accounts should have been disclosed in the Schedules and on the SoFA." [Mem., DN 7-1, at 53]. In response, Appellant contends that the meaning of "transfer" on the forms would not have been "transparently plain" to a "layperson" because the forms fail to define "transfer." This argument would possibly have more of an impact if Mr. Eifler was not a sophisticated businessperson who started consulting with an attorney about the possibly of a bankruptcy more than a year prior to filing. "'[A] well-educated, long-experienced and sophisticated businessman' is expected to answer with more care and accuracy than a financially unsophisticated one." In re Adler, 494 B.R. 43, 78 (Bankr. E.D.N.Y. 2013) (quoting Maring v. PG Alaska Crab Inv. Co., 338 Fed. Appx. 655, 658 (9th Cir. 2008)). Additionally, considering Mr. Eifler reviewed the forms multiple times with the assistance of Mr. Frentz, the Court struggles to believe that Mr. Eifler did not have the opportunity to ask what a term meant if he did not understand it. "A debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." In re Tully, 818 F.2d 106, 111 (1st Cir. 1987).

Even assuming *arguendo* that Appellant reasonably believed that the transfers to Mrs. Eifler did not need to be reported, Appellant fails to explain why he did not need to report the other transfers he made. Appellant's counsel on appeal makes a valiant effort to explain why Mr. Eifler failed to report the pre-payment of tuition on the SoFA, but the marital property theory would not include these transfers as they were made from Mr. Eifler's individual Fidelity account. The Court cannot help but to observe that the *multiple* pre-payments of tuition occurred

just one month prior to Mr. Eifler filing his SoFA. Additionally, Mr. Eifler omitted the $20,000 transfer to his sister-in-law made just six months prior to submitting his SoFA. In fact, Mr. Eifler failed to disclose a single transfer or gift on his SoFA. Appellant argues that these omissions were inadvertent; however, the Court agrees with the Bankruptcy Court that observed, "Again, a single mistake could be explained in such a fashion. The multiple omissions in this case evidences more than a single error, but instead a pattern of false statements." [Mem., DN 7-1, at 52]. The failure to list the multiple tuition payments and the transfer to the sister-in-law by itself clearly establishes that the Bankruptcy Court did not err in finding that Appellant-Debtor made false oaths.

Appellant hopes to shift blame to Mr. Frentz since he had advised Mr. Eifler about the pre-payment of the tuition and the transfer to his sister-in-law.[7] Appellant cannot point to a single piece of testimony to support that Mr. Frentz instructed him to not report the tuition pre-payments and the transfer to his sister-in-law. In fact, the method that Mr. Frentz utilizes in having clients review their forms multiple times before he meets with them reveals that it is incumbent on the clients to find their omissions and correct them. Instead, Appellant contends that because Mr. Frentz was aware of those transfers, he should have spotted Appellant's omissions on the Schedules and SoFA. The Appellant cannot simply hope to dump "all of the pertinent financial documents" [Reply Br. of Appellant, DN 16, at 24] on Mr. Frentz and then argue a reliance-on-counsel defense. The duty to *fully* disclose information on the SoFA and the Schedules falls squarely on Appellant-Debtor, not his attorney. "A debtor has an affirmative

---

[7] Apparently, it is not uncommon to have the debtor's attorney fall on the sword on behalf of the debtor. A bankruptcy court lamenting a similar situation observed the following:

> The debtor's position is that he made a transfer openly and legally and as part of the pre-bankruptcy planning. This he says was based upon advice of counsel who then prepared the necessary petition and schedules for filing under Chapter 7. These schedules do not reveal the transfer. It is fair to ask-why not? Debtor replies, "It is a mistake"; and counsel says, "Blame me, not the debtor-it was due to mistake and inadvertance."

In re Collins, 19 B.R. 874, 878 (Bankr. M.D. Fla. 1982).

duty to disclose all of its assets to the bankruptcy court." <u>Browning v. Levy</u>, 283 F.3d 761, 775 (6th Cir. 2002).

In addition to failing to identify multiply transfers made less than a year before filing for bankruptcy, Appellant omitted three bank accounts from his Schedule B as well as did not report the Joint Fidelity Account that he closed on his SoFA. Appellant contends that the Joint Fidelity Account and the brokerage account did not need to be listed under Number 11 of the SoFA, requiring the listing of all closed accounts within the past year, because they were not closed at the time he filed for bankruptcy. Even if the Court were to accept this argument, Appellant acknowledges that "Schedule B (debtor's personal property) arguably would require the disclosure of these accounts, because each had a nominal cash value." [Br. for Appellant, DN 6, at 43]. However, Appellant contends that he should not be denied a discharge for failing to report less than $30 on his Schedule B. If those two accounts were the only items omitted from Appellant's filings, it is doubtful that a denial of discharge under § 727(a)(4)(A) would even be discussed. The problem is that these were not the only omissions made by Appellant-Debtor in the course of the bankruptcy process. As already discussed, Appellant failed to disclose numerous transfers on the SoFA. The cumulative effect these omissions, as concluded by the Bankruptcy Court, evidences that Appellant made false statements under oath with the intent to defraud creditors.

Finally, Appellant argues that his "openness throughout the bankruptcy process and the extended pre-bankruptcy workout efforts are inconsistent with the conduct of a debtor intending to commit fraud." [Br. for Appellant, DN 6, at 47]. In furtherance of this contention, Appellant identifies the two creditors' meetings that he attended as well as the multiple documents that he produced during the process. However, Appellant's own factual account undermines his position

in this instance. Specifically, Appellant believes that producing documents at the request of parties and providing answers during the meeting of creditors absolves him of a denial of dischargeability under § 727(a)(4)(A). Although courts in the Sixth Circuit look favorably on debtors that report omissions during the meeting of creditors, this generally requires debtors to actually amend their SoFA and schedules. In re Courtney, 351 B.R. 491 (Bankr. E.D. Tenn. 2006) ("[C]ourts do not generally find that debtors . . . who amend their schedules and report omissions or misstatements prior to or during their meetings of creditors possess the requisite fraudulent intent for denial of their discharge under § 727(a)(4)(A)."). In fact, Mr. Eifler did not even take advantage of the time between the two meetings with the creditors in order to amend his Schedules and SoFA.[8] Appellant failed to take any affirmative steps that would indicate an "openness" during the bankruptcy process.

For the reasons discussed, the Court finds that the Bankruptcy Court did not err in denying discharge under § 727(a)(4)(A).

## IV. CONCLUSION

For the foregoing reasons, the opinion and order entered by the Honorable Alan C. Stout, U.S. Bankruptcy Judge for the Western District of Kentucky, denying discharge of indebtedness pursuant to 11 U.S.C. § 727(a)(2), (a)(4), and awarding judgment in favor of Wilson & Muir in the amount of $1,701,793.66, plus pre- and post-judgment interest, costs, and attorneys' fees is **AFFIRMED**. Additionally, the Court **DENIES** Appellee's Motion for an Oral Argument [DN 17].

_Joseph H. McKinley_

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

January 27, 2014

---

[8] As Appellant notes in his brief, he revealed the fact that he had made tuition pre-payments at the February 2, 2012 meeting of the creditors. However, even with a full month to make changes to his filings before the second meeting of creditors held in March, Mr. Eifler chose not to amend.

cc: counsel of record
    Honorable Alan C. Stout, U.S. Bankruptcy Judge